Filed 12/21/22  Marriage of Stewart CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of COURTNEY and JAMES C. STEWART. _____ COURTNEY JANE, Appellant, v. JAMES C. STEWART, Respondent. | B311315 (Los Angeles County Super. Ct. No. SD018483) ORDER MODIFYING THE OPINION (CHANGE IN THE JUDGMENT) AND DENYING APPELLANT'S PETITION FOR REHEARING |

THE COURT:

The opinion in the above-entitled matter filed on November 22, 2022 is modified as follows:

1. On page 2, before the sentence "In all other respects, we affirm.", the following two sentences are inserted:

Finally, we conclude the court erred in denying Jane's request under section 2030 for attorney fees and costs, because the court did so based on the view that Jane's efforts to seek additional

child support from Stewart lacked merit—a view we reject in deciding the child-support-related issues on appeal. We therefore reverse the court's denial of Jane's fees and costs motion and instruct the court, following remand, to consider whether, in light of this opinion and the materials Jane submitted to support her request, she has established entitlement to reasonable fees and costs under section 2030, and if so, in what amount.

2.     On pages 15-16, the entire paragraph, under part H.3. of the Facts and Proceedings Below section, is deleted and replaced with the following paragraph under the same heading:

Jane's sanctions motion also included a request for section 2030 attorney fees "predicated on [Jane's] need and [Stewart's] ability to pay." The supporting documentation for this request did not include any invoices from Jane's counsel, although a subsequently filed updated declaration of Jane's counsel attached billing records reflecting 422.4 hours and approximately $211,200 in fees. Jane also submitted an income and expense declaration.

3.     On pages 41-43, the entirety of part E. of the Discussion (including the footnote contained therein), is deleted and replaced with the following:

E.     *Attorney Fees Request*

Section 2030 authorizes a court to order, "if necessary based on the [court's] income and needs assessments" of the two parties in a dissolution or related action, that one party pay the attorney fees and costs of the other party "reasonably necessary" to maintain or defend the proceeding. (See § 2030, subd. (a)(1).) "[T]he making of the award, and the amount of the award, [must be] just and

2

reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) In determining what a "just and reasonable" amount of attorney fees and costs in a particular case is, the trial court should consider, in addition to the parties' relative financial circumstances, " ' "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed. [Citations.]" [Citations.]' " (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870.) The party seeking the fees bears the burden of proving entitlement thereto, including providing sufficient information about the services rendered to establish the fees sought were reasonably necessary. (See Cal. Rules of Court, rule 5.427(b); see *Keech, supra,* at p. 869.)

The court deemed the fees Jane sought to be unreasonable based solely on the court's view that Jane's RFO and other efforts lacked merit—that they amounted to "sort of a costly kind of fishing expedition that really was based on . . . wishful thinking and a real misunderstanding about how incentive compensation works and . . . when it's income for support purposes under both the parties' agreed-upon orders and the background law." For the reasons discussed above, Jane's RFO did not lack merit in this manner, so the nature of the relief she was seeking could not render all the services her counsel performed inherently unreasonable. The court abused its discretion in denying Jane's request for fees and costs as unreasonable on this basis.

Because of the basis for the court's denial, the court did not have occasion to decide the numerous other factors relevant

3

to assessing what amount of attorney fees and costs, if any, she had established a right to recover under section 2030. For example, the court does not appear to have assessed Jane's relative ability to pay beyond generally noting that "certainly [Stewart's] financial . . . ability is better than [Jane's]," or the reasonableness of the amount of time Jane's counsel spent to seek relief that, as we conclude above, Jane was justified in seeking. The trial court is in the best position to consider these issues, and we decline to address them for the first time on appeal. We therefore reverse the denial of Jane's motion for attorney fees and costs and instruct the court upon remand to consider Jane's motion in light of our opinion and determine whether Jane has sufficiently established her entitlement to reasonable attorney fees and costs under section 2030 and, if so, in what amount.

4. On page 44, the entirety of the Disposition is deleted and replaced with the following:

## DISPOSITION

The court's February 2021 order on the amended child support RFO is reversed to the extent it denies Jane *Ostler-Smith* child support based on the $800,000 cash bonus Stewart received from MGM Growth around December 2017 and the $400,000 bonus PSU grant Stewart received around December 2016. Upon remand, the court is instructed to determine the pro rata portion of that bonus income attributable to the support period, and to order the corresponding amount of *Ostler-Smith* child support.

4

The court's order imposing sanctions against Jane is reversed.

The court's denial of Jane's request for attorney fees and costs under section 2030 is reversed.  The trial court is instructed to consider Jane's request and determine whether, taking into consideration our opinion and the materials Jane presented to support her motion, Jane has sufficiently established her entitlement to reasonable attorney fees and costs under section 2030 and, if so, in what amount.

The court's orders are in all other respects affirmed, including specifically its denial of section 271 sanctions against Stewart.

The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

_____

These modifications constitute a change in the judgment.

Appellant's petition for rehearing filed on December 7, 2022 is denied.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENKE, J.*

_____

*Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 11/22/22  Marriage of Stewart CA2/1 (unmodified opinion)
# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re the Marriage of COURTNEY and JAMES C. STEWART.<br>_____<br>COURTNEY JANE,<br><br>Appellant,<br><br>v.<br><br>JAMES C. STEWART,<br><br>Respondent. | B311315<br><br>(Los Angeles County Super. Ct. No. SD018483) |

APPEAL from orders of the Superior Court of Los Angeles County, Lynn H. Scaduto, Judge. Affirmed in part and reversed in part with directions.

Robert K. Kent for Appellant Courtney Jane.

Kermisch & Paletz, Daniel J. Paletz and Eden C. Bautista for Respondent James C. Stewart.

Appellant Courtney Jane appeals from several postjudgment orders of the trial court in proceedings regarding child support obligations of her former husband, respondent James Stewart. Specifically, she challenges the court's rulings: (1) denying her request for an order that Stewart owed her child support arrearages, (2) imposing sanctions against her under Family Code section 271[1] and Code of Civil Procedure sections 2030.090, 2031.060, and 2033.080, (3) denying her request for section 271 sanctions against Stewart, (4) granting Stewart a protective order in response to Jane's discovery requests, (5) denying her request for need-based attorney fees under section 2032, and (6) failing to rule on certain of Jane's evidentiary objections. We conclude the court erred in denying Jane's request for certain child support arrearages based on (1) a cash bonus Stewart received after the support period, but which was in part compensation for work he had performed during the support period, and (2) a stock grant bonus that vested, but was not yet saleable, during the support period. We otherwise affirm the court's order regarding child support. We further conclude the trial court erred in its ruling regarding sanctions against Jane and reverse the court's order imposing them. In all other respects, we affirm.

## FACTS AND PROCEEDINGS BELOW

Jane and Stewart married in 1993 and have two now adult children together: Cecelia (24 years) and James (27 years). Stewart and Jane divorced pursuant to a stipulated judgment of dissolution in 2003 (the 2003 judgment).

---

[1] Unless otherwise indicated, all statutory references are to the Family Code.

2

## A. *The Structure of Stewart's Compensation*

The 2003 judgment included detailed provisions regarding, among other things, child support for Cecelia and James. These provisions took into account the structure of Stewart's compensation at Morgan Stanley, where he was employed at the time of the judgment. His compensation there was comprised of a base salary, cash bonuses, and vesting stock grants. Vesting stock grants are a promise to give an employee shares in the future if certain conditions are met. They "vest[ ] and became saleable on schedules set by the . . . compan[y], usually ranging over several years." Although Stewart changed employers several times throughout the support period, his compensation at all of these employers likewise had a base salary component, cash bonus component, and a vesting stock grant component. At Morgan Stanley, the vesting stock grant component was referred to as the equity incentive compensation plan (EICP). At UBS, it was referred to as the employee ownership plan (EOP). At both Greenhill & Company LLC (Greenhill) and MGM Growth Properties Inc. (MGM Growth), the vesting stock grant income was referred to in terms of restricted stock units (RSUs) or preferred stock units (PSUs).

Stewart's compensation at MGM Growth is the source of the income at issue in this appeal, so we describe it in more detail. The RSUs and PSUs offered at MGM Growth are long term incentive compensation devices that, as noted, did not vest until years after they were granted. Before vesting, these grants were subject to forfeiture upon termination of employment. Whether Stewart received any value from his RSUs and/or PSUs after they vested, and in what amount, depended on various performance factors.

Stewart's compensation at MGM Growth also included the potential for a fourth type of compensation, referred to in 2016 as a

3

"bonus PSU" and in 2017 as a "bonus deferred RSU." (Capitalization omitted.) These components came into play only if MGM Growth determined Stewart should receive an end-of-year bonus in an amount more than the amount of his base annual salary—that is, in 2016, a bonus of more than $763,956 and in 2017, a bonus of more than $800,000. If that occurred, MGM Growth "paid" Stewart the portion of his bonus exceeding the amount of his base annual salary using these devices. Put differently, if Stewart earned a bonus of more than $763,956 for the year 2016, he would receive $763,956 of that bonus in cash, and the remainder of the bonus in the form of bonus PSUs; if Stewart earned a bonus of more than $800,000 for the year 2017, he would receive $800,000 of the bonus in cash, and the remainder of the bonus in the form of bonus deferred RSUs.

"Unlike PSUs [or RSUs]"—which vest on a date years after the company grants them—"[b]onus PSUs are 'vested' as of the grant date" and they "are not subject to forfeiture in the case of a participant's termination of employment." "Once granted," "payment of [b]onus PSU is based on the company's TSR [total shareholder return] as measured over a three[-]year performance period," meaning they become liquid, if at all, three years after the grant date. (Capitalization omitted.) Similarly, the [b]onus [d]eferred RSU awards for which Stewart was eligible in 2017 "are 'vested' as of the grant date." "The payment of [b]onus [d]eferred RSU awards is deferred until the third anniversary of the grant date."[2] With this understanding of Stewart's compensation, we turn to the terms of the 2003 judgment.

_____

[2] Although not significant for our purposes on appeal, bonus deferred RSUs are distinct from bonus PSUs in that, although both types of stock grants are "vested" as of the grant date in the sense

## B. *Child Support Provisions of the 2003 Stipulated Judgment*

The child support provisions of the 2003 judgment required Stewart to pay a monthly amount of child support "[b]ased on his current base salary" as well as certain "add-ons" based on additional income Stewart was eligible to receive at the end of a year, if he received it.[3]  Specifically, the "add-ons" the 2003 judgment required Stewart to pay were (1) "[e]ight percent (8 [percent]) of [any] gross bonus income" and (2) "[e]ight percent

_____

that they are not forfeited upon termination of employment, deferred bonus RSUs "are not subject to the achievement of additional performance criteria."  By contrast, even after bonus PSUs are " 'vested,' " they remain "subject to forfeiture in the event that the threshold level of the company's TSR measurement over the performance period is not met." (Capitalization omitted.)  The replacement of bonus PSUs with deferred bonus RSUs reflected a change in compensation structure at MGM Growth starting with compensation for the year 2017 (and thus affecting annual bonuses received at the end of the year, and/or at the beginning of 2018). "The board determined that this design change was appropriate given that the executive had already achieved the level of performance necessary in order to earn an annual bonus payout in an amount exceeding his or her base salary."

[3] In family law parlance, an award of child support based upon a percentage of bonus income is often referred to as a "*Ostler-Smith* award" or *Ostler-Smith* support.  (See *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 52−54 [permitting such an award based on child's right to "share his or her parents' standard of living" and the code's express reference to bonuses as a source of income to consider].)  Thus, the parties and lower court refer to the percentage amounts of income the 2003 judgment obligated Stewart to pay as the *Ostler-Smith* percentage, or *Ostler-Smith* support.  We will at times employ this same terminology.

5

(8 [percent]) of the gross amount of the [EICP] (includes units and options . . . ) vesting during the term . . . not more than ten (10) days after receipt of any bonus." As to the first type of "add-on," the judgment defines "[b]onus income" as "all income from employment in excess of base salary . . . and does not include other investment income of any description." As to the second type of "add-on," the judgment further provides that "EICP becomes the property of [Jane] upon vesting and shall be paid to her by [Stewart] upon EICP becoming saleable." If and when Jane receives child support funds based on EICP, she must deposit those funds "into two equal long term investment accounts, one for each of the children, to be turned over to the respective child upon reaching age 25."

Section 3.2 of the 2003 judgment further provides that the child support obligations described in the judgment "shall cease to be due for each child" when "[Jane] dies, the child dies, the child is emancipated, or the child reaches the age of 18 (except that an unemancipated 18-year-old unmarried child, who is a full-time high school student and is not self-supporting, shall be entitled to continued support until the completion of the 12th grade or attaining the age of 19)," whichever occurs first. Notably for the purpose of Jane's arguments on appeal, section 3.2 also provides that Stewart's child support obligations under the stipulation "include[ ] the pro rata portion of [Stewart's] add-on income for that calendar year, which is paid in the following calendar year (currently January). For example, though child support may end for one child in June, the pro rata share of add-on income would be distributed the following January." (Capitalization omitted.)

The 2003 judgment contemplated that Stewart's child support obligations could potentially increase or decrease with changes in his compensation over time, and obligated Stewart to notify

6

Jane of any such changes. In addition, the judgment required the parties to "exchange the following information each year when filed: W-2's, 1099s, [and] federal and state income tax returns." (Capitalization omitted.) The judgment does not expressly state when this obligation ends.

This court interpreted these EICP provisions in an unpublished April 2010 decision. That decision clarified, inter alia, that "EOP stock" grants—the vesting stock grants component of Stewart's compensation at UBS—were the equivalent of the EICP stock grants the 2003 stipulated judgment expressly addresses, the interpretation urged by Stewart on appeal.[4] This court explained: "The shared characteristics of these noncash stock benefits of requiring vesting and lengthy periods before becoming convertible into cash [are] unique to this category of compensation. In contrast, when bonuses are awarded by either Morgan Stanley or UBS, their value was set on an annual basis, expressed in dollar terms, and paid in cash on a date certain. [¶] Because both EICP and EOP share the same characteristics, they are the functional equivalent of each other, and should have been treated the same under the stipulated judgment."

### C. *2013 Stipulation Amending the 2003 Stipulated Judgment*

Pursuant to subsequent stipulations, the parties agreed to increase Stewart's monthly base child support obligation and

---

[4] Specifically, Stewart argued that the lower court had erred in failing to treat EOP stock as the equivalent of EICP stock, and in instead treating EOP stock grants as " 'gross bonus income' " for the purposes of calculating *Ostler-Smith* support under the agreement. Stewart prevailed on this issue on appeal, but did not prevail on other issues in the appeal.

7

*Ostler-Smith* percentage obligation in both 2010 and 2012. These increases were a function of a raise in Stewart's base salary and Jane taking over full-time custody of the children, respectively.[5]

Sometime thereafter, Jane filed a request for an order to determine child support arrears under the 2003 judgment and 2010 and 2012 stipulations. The court's order on this request is not in the record on appeal, nor are the contents thereof described in the record. The order resulted in an appeal and cross-appeal, which, in October 2013, the parties agreed to dismiss pursuant to a stipulation (the 2013 stipulation) resolving all issues raised in the appeals and amending the 2003 judgment. These disputes included, inter alia, different interpretations of how the 2003 judgment's provisions applied to dividends from RSUs, the form of vesting stock grants Stewart received from his then-current employer, Greenhill. The 2013 stipulation provided as follows: "Commencing January 1, 2013, the [p]arties agree and confirm that RSU [d]ividends received by [Stewart] from his employer, Greenhill . . . or any other similar payment received by [Stewart] from Greenhill or such other employer that [Stewart] may have in the future, shall not be considered 'earned income' for purposes of bonus child support (Ostler[-]Smith). The distinguishing characteristic of income that will not be considered 'earned income,' even if it appears on [Stewart's] W-2 as income, is that said income will be passive in nature, such as dividends, interest or other investment income, i.e., income derived from assets and/or

---

[5] Under the 2003 judgment as amended, the *Ostler-Smith* percentage was 10.95 percent for two children. The parties agree that, because James had aged out by the time of the support payments at issue on appeal, the applicable *Ostler-Smith* percentage for Cecelia alone is 62.5 percent of 10.95 percent, or 6.84 percent.

8

investments owned by [Stewart] as contrasted with income from [Stewart's] labor." The 2013 stipulation went on to provide "[a]s further clarification . . . annual bonus income is defined as follows: [¶] . . . annual income . . . [on W-2] less base salary . . . less the line item RSU dividends [year-to-date] amount from Stewart's] year[-]end pay stub." (Capitalization omitted.)

### D. *2014 Stipulation Further Amending 2003 Judgment*

In November 2014, through another stipulation (the 2014 stipulation), the parties "modified" the portion of the 2013 stipulation quoted above—and, by extension, the 2003 judgment— "to state that [Stewart] shall pay Ostler/Smith bonus child support based on his gross income as reflected on his pay check stub less base salary, RSU dividends and dental-SEC 125 and medical SCE-125 under 'other deductions from pay' on said pay check stub." (Capitalization omitted.) The 2014 stipulation resulted from a request for order (RFO) Jane had filed seeking child support arrears. The stipulation also required, as "full settlement of all monetary claims of [Jane] in her . . . request for order" that Stewart pay Jane $20,0000. (Capitalization omitted.)

### E. *Jane's Efforts To Secure Tax and Other Documents From Stewart*

According to Jane, since 2015, Stewart refused her requests for the tax documents the parties had agreed to exchange in the 2003 judgment so that she could determine whether the support payments she had received were complete and accurate. The record reflects that, with each *Ostler-Smith* payment, Stewart provided to Jane an accounting of how he had calculated the amount paid, but did not provide documentation to support those calculations.

9

In June 2017, Cecelia graduated high school, thereby terminating Stewart's monthly child support obligations. The parties disagreed as to whether Stewart could owe *Ostler-Smith* child support based on income he received in 2018 as a bonus for work performed, at least in part, in the first half of 2017 before the child support obligation terminated.

Jane took the position that he could, and her counsel requested from Stewart's counsel an informal production of documents regarding Stewart's income that "would enable [Jane's counsel] to determine if there was an arrearage in child support payments" based on income received after the support period ended. Specifically, in a February 19, 2019 letter to Stewart's counsel (Daniel Paletz), Jane's counsel (Robert Kent) requested 11 categories of documents and information, including Stewart's federal income tax returns for the years 2015, 2016, and 2017, Stewart's final pay check stub for 2018, W-2's, 1099's and all similar documents for the years 2015 through 2018, "[c]opies of all written agreements between . . . Stewart and his present employer," "[a] statement as to the date and amount of each payment that . . . Stewart has received from his present and past employers other than base salary since November 26, 2014," and several other categories of documents and information. Some of these requests required Stewart to compile and analyze information; for example, Kent's request for "[a] detailed statement or explanation from . . . Stewart concerning whether any payments or benefits he has received from his present employer subsequent to the termination of child support in or about June 2017 relates to services rendered by . . . Stewart in whole or in part prior to the termination of child support."

The record on appeal indicates that, in response, Stewart's counsel refused to produce any documents or provide any

information concerning Stewart's income and threatened to seek sanctions if Jane pursued these requests through formal court channels.

**F.     *Jane's 2019 RFO to Determine Past Due Child Support and Compel Production of Related Documents***

In October 2019, Jane filed a request for an order (the child support RFO) seeking "determination of past due child support re[garding] Cec[e]lia Stewart" and further seeking to "compel[ ] [Stewart] to produce documents necessary" to determine any past due amounts of support. As the basis for her RFO, Jane cited the 2003 judgment's requirement that the parties exchange various tax and financial documents, which she claimed Stewart had not done since 2014, and Stewart's refusal to provide these documents in response to the informal requests by her and her counsel. Jane argued these documents were necessary to determine what portion of Stewart's bonus income received between June 2017 and 2018 was attributable to labor performed before June 2017, and thus, according to Jane, subject to Stewart's *Ostler-Smith* support obligation. She also cited, through her own declaration and that of her attorney, Stewart's "incessant efforts . . . to chip away at the child support he pays" over the years, and that "[i]n the past it [had] tended to be very difficult to obtain information and documents." The child support RFO also cited the "historical problem" that, based on the information Stewart provided to substantiate the child support payments he made, and the fact that he often did not receive bonus income for a given year until the next calendar year, "it [was] very difficult . . . to reconcile the payments [Jane] received" with the tax documents Stewart later provided.

11

### G. *Jane's Discovery Requests and Related Correspondence Between Counsel*

In December 2019, Jane served Stewart with a set of requests for production seeking 20 categories of documents similar to those Jane had informally requested earlier the same year. Stewart agreed to and did produce some of the requested documents, including some tax documents for 2015 and 2016, but the record on appeal does not show that he produced any tax documents or pay stubs for 2017 or 2018 or any complete tax returns for any years.

The parties conferred further via subsequent correspondence through the first half of 2020. Jane's counsel requested more complete responses, including specifically 2017 and 2018 tax documents. Stewart's counsel maintained that Stewart had provided, contemporaneous with each *Ostler-Smith* payment, detailed calculations and pay stubs explaining and supporting the payment amount, and was not obligated to provide additional documentation. Specifically, Stewart's counsel indicated: "Stewart's only affirmative obligations are those outlined in the [j]udgment and subsequent orders. The documents you purport to need are irrelevant to this proceeding and the pay stubs [are] all that were needed to run the proper calculations. [¶] . . . [Jane] would have properly been within her rights to ask annually for an updated income and expense declaration and tax returns using a form FL-396. It appears that she failed to do that ever in this matter." (Capitalization omitted.)

Stewart's counsel further indicated that, since approximately 2014, Stewart had actually been paying more *Ostler-Smith* support than the 2003 judgment, as amended by subsequent stipulations, required, in part because he had incorrectly failed to deduct his full base salary from the amount to which he applied the *Ostler-Smith* percentage. Stewart's counsel provided detailed calculations in his

correspondence explaining this position and the amount Stewart believed Jane owed him as a result of overpayment.

Although Jane's counsel did not offer specific calculations as to the amount of child support she believed Stewart owed her, she identified specific income that she believed Stewart had not disclosed and on which he had not paid child support. This income was reflected in certain key documents Jane's counsel identified in the parties' correspondence: (1) a W-2 from MGM Resorts International (MGM Resorts) that Stewart produced in discovery, reflecting that MGM Resorts had paid Stewart $89,231 in early 2016; and (2) 2017 and 2018 MGM Growth proxy statements that Jane had obtained from public records, reflecting approximately $4 million MGM Growth had paid Stewart between 2016 and 2018 for work he performed in 2016 and 2017, but that Stewart had not included in the income he had previously reported to Jane and paid child support on. This income was comprised of cash bonus payments, vesting stock grants (specifically RSUs and/or PSUs), bonus PSUs (as part of his 2016 bonus) and deferred bonus RSUs (as part of his 2017 bonus).[6]

---

[6] The MGM Growth proxy statements use a dollar amount, sometimes referred to as a "grant date fair value of award" to describe the amount of RSUs, PSUs, bonus PSUs, and bonus deferred PSUs awarded in a given year. The manner in which the proxy statements calculate this amount is not relevant to our analysis. It bears mention, however, that this value is not necessarily the value Stewart will be able to realize, if and when the stocks underlying the grant vest and/or become saleable years after the grant date.

13

## H.    *The Parties' Motions for Sanctions*

### 1.    *Stewart's motion for sanctions*

On May 5, 2020, Stewart's counsel informed Jane's counsel Stewart would file a motion for sanctions if Jane did not take the child support RFO off calendar.  On May 21, 2020, Stewart served a sanctions motion on Jane.  Jane did not take the child support RFO off calendar, and Stewart filed his sanctions motion on June 12, 2020.

The motion argued that the child support RFO was frivolous and in bad faith.  Stewart supported the motion with declarations indicating he had "consistently sent [Jane] the guideline child support payments and Smith/Ostler payments, along with correspondence that explained the breakdown of his Smith/Ostler calculation as well as copies of his paycheck stubs," yet Jane had never challenged the amount of these payments until years after the child support period ended.  As to Jane's concerns regarding income reflected in the MGM Growth proxy statements, the motion argued the plain language of the parties' stipulations, as interpreted and applied by the trial court and Court of Appeal, did not require him to report or pay child support on the unreported income Jane identified.  In so arguing, Stewart's sanctions motion raised two related issues that would become the cornerstone of virtually every filing made by either party thereafter:  (1) whether and to what extent the 2003 stipulation, as amended, required Stewart to pay *Ostler-Smith* support based on stock grants he received for work performed during the support period, but that did not become liquid/saleable until after the support period (the stock grant issue), and (2) whether the 2003 stipulation, as amended, required Stewart to pay *Ostler-Smith* support based on bonus income received after the conclusion of the support period, but based on work performed during the support period (the

14

deferred compensation issue).  Stewart argued that Jane's interpretation of the applicable stipulations on these points was frivolous, and that Jane's RFO therefore "lack[ed] any evidentiary support" and was being brought solely to harass Stewart.

Appellant filed two ex parte motions to strike Stewart's sanctions motion, which the court denied.  In her opposition to the sanctions motion, Jane argued it would be illogical for her to take the child support RFO off calendar—the only alternative to the sanctions motion that Stewart had indicated he would consider—given the MGM Growth and MGM Resorts documents suggesting Stewart had not fully reported his 2016 and 2017 income from MGM Growth and MGM Resorts.  Jane argued that Stewart's claim that the child support RFO was frivolous was based on *his* clearly erroneous interpretation of the 2003 judgment.  Finally, Jane also argued that the requested sanctions would cause her unreasonable financial hardship.

### 2.  *Jane's motion for sanctions*

In addition to opposing Stewart's motion for sanctions, Jane filed her own motion for sanctions against Stewart pursuant to section 271, based on largely the same arguments she had raised in opposing Stewart's motion.  Jane took the position that her child support RFO was plainly meritorious, rendering Stewart's refusal to provide related documents and refusal to negotiate a settlement involving less than a full withdrawal of the child support RFO obstructionist and worthy of sanctions.

### 3.  *Jane's motion for section 2030 attorney fees*

Jane's sanctions motion also included a request for section 2030 attorney fees "predicated on [Jane's] need and [Stewart's] ability to pay."  The supporting documentation for

15

this request did not include any invoices from Jane's counsel. Rather, as support for the amount of fees reasonably incurred, Jane offered the declaration of her attorney, describing much of the correspondence between himself and Stewart's counsel, indicating that he "ha[d] spent more than 350 hours on this matter," that "[m]ore than eighty percent (80 [percent]) of [his] time ha[d] been spent on matters that should not have been necessary, such as [Stewart's] discovery obstruction," and that his "customary hourly billing rate and my agreement with [Jane] is $500.00." Jane also submitted an income and expense declaration.

### 4. *Jane's additional filings regarding Stewart's sanctions motion*

Both contemporaneous with her opposition to Stewart's motion for sanctions, and in the months that followed, Jane filed numerous additional documents related to Stewart's sanctions motion. These included evidentiary objections to and a motion to strike various declarations of Stewart's counsel, multiple requests for judicial notice, multiple responsive declarations, and multiple "sur declaration[s] . . . in support of opposition to [Stewart's] sanction motions." (Boldface & capitalization omitted.)

### I. *Jane's Motion to Compel Discovery Responses and Stewart's Protective Order Request*

Correspondence between the parties reflects that, throughout 2020, Jane continued to view Stewart's discovery responses to her first set of interrogatories and requests for production as insufficient. Stewart's counsel continued to maintain that Jane had been provided all documents in his possession that, based on his interpretation of the stock grant and deferred compensation issues, were relevant to his child support obligations.

16

Jane moved to compel Stewart to provide further responses and documents. On June 17, 2020, Stewart filed a request for a protective order and a request for sanctions under Code of Civil Procedure sections 2030.090, 2031.060, and 2033.080. Following a hearing, the court granted the protective order. Specifically, the court found Jane's interrogatories and requests for production were "unduly burdensome" and ordered that Stewart "need not produce further responses." The court deferred Stewart's request for sanctions for consideration at the hearing on the child support RFO and the other sanctions requests.

### J. *Jane's Amended Request for Order Focusing on Income Reflected in MGM Resorts and MGM Growth Documents*

On December 15, 2020, Jane filed an "amended RFO to determine child support arrearage, to order [Stewart] to pay arrearage, and for punitive damages" (the amended child support RFO). (Capitalization omitted.) It argued Stewart owed child support based on income he had not reported, but that was reflected in the MGM documents Jane had obtained since filing the original child support RFO (the 2016 MGM Resorts W-2 and 2017 and 2018 MGM Growth proxy statements discussed in the parties' correspondence and sanctions motion briefing). Specifically, she sought child support based on approximately $1 million in RSU and PSU grants Stewart received in April 2016, approximately $1.5 million in RSU and PSU grants Stewart received in April 2017, $400,000 in bonus PSUs granted to Stewart around December 2016, and an $800,000 cash bonus Stewart received around December 2017.

As with the briefing regarding the motions for sanctions, the amended child support RFO primarily focused on the stock grant issue and the deferred compensation issue as determining whether

17

these MGM documents reflected additional income on which Stewart should have to pay child support. Specifically, Jane argued that Stewart had "intentionally misread" the applicable stipulations as excluding from the income on which he was to pay *Ostler-Smith* child support: (1) stock grants MGM Growth paid Stewart for services Stewart rendered during the support period (regardless of when they vested or became liquid/saleable), and (2) bonuses in the form of both cash and stock grants (specifically, bonus PSUs and bonus deferred RSUs) that MGM Growth paid Stewart after the support period for services Stewart rendered during the support period. As proof that the MGM Growth bonuses at issue were compensation for work that was, at least in part, performed during the support period, Jane pointed to the description in the MGM Growth proxy statements of Stewart's bonus income. For example, the 2018 proxy statement reflects that, in calculating Stewart's bonus amount for 2017, the board considered his "business contributions . . . in connection with the issuance of equity at a public offering" that occurred in 2017 as well as his "assistance in the re-pricing of the Operating Partnership's Term Loan B facility in May 2017" and "[t]he successful execution of the MGM National Harbor Transaction."

In addition to child support that Jane argued Stewart owed based on his unreported MGM Growth bonus and stock grant income, the amended child support RFO claimed Stewart had not paid support based on $89,230.79 worth of non-bonus cash income reflected in the 2016 MGM Resorts International W-2.

The amended child support RFO also sought "punitive damages" "based on [Stewart's] fraud including concealing from [Jane] compensation and bonus compensation paid to [Stewart] that was subject to child support obligations."

18

The amended request contained nearly 600 pages of supporting documents, including a declaration of Fred Quiel, an attorney "specializ[ing] in labor matters," who opined, based on an analysis of Stewart's employment agreement with MGM Growth, that "bonus compensation was guaranteed by the terms of the contract." Specifically, he opined: "[T]he contract signed by . . . Stewart [in 2016] guaranteed that all components of compensation awarded for the next three years (the term of the contract), including stock grants were payable as of the date the contract was signed and executed. The three-year-contract states that all compensation awarded during the term is earned as awarded and not subject to forfeiture. Specifically, any compensation awarded in 2016 and 2017 is earned and payable even if it vests/pays in subsequent years. The contract supersedes the ability to lose portions of compensation awards." (Italics omitted.) Jane offered this declaration in response to an argument she anticipated Stewart would make, that stock grants could not constitute earned income because they "had a contingency component" and thus were to be treated like the EICP grants referred to in the 2003 judgment and discussed in the Court of Appeal decision summarized above.

Jane's supporting documentation also included a declaration of forensic accountant expert Renee Howdeshell. Howdeshell calculated the amount of unpaid child support Stewart owed, based on her review of various income and tax documents from Stewart, as well as an assumption that "all bonuses initially awarded in 2017 should be included [as a basis for *Ostler-Smith* support] until such time as it is demonstrated that they do not relate to activity in the covered period."

In response to Jane's amended child support RFO, Stewart took the position, via responsive declarations of himself and his counsel, that (1) he had fully complied with the relevant

stipulations and was not in arrears, (2) he had in fact overpaid *Ostler-Smith* support based on a calculation error, and (3) Jane's arguments to the contrary were attempting to relitigate an issue that had been repeatedly settled by the parties and the court via the 2003 judgment and multiple stipulations. Stewart sought reimbursement of $54,354.48 in claimed overpayment. Stewart's responsive papers did not address the income from MGM Resorts Jane claimed he had failed to report.

### K.    *The January 20, 2021 Hearing*

On January 20, 2021, the court partially heard the amended child support RFO, sanctions motions, request for section 2030 attorney fees, and request for attorney fees in connection with the previously granted protective order. At the hearing, the court heard argument regarding the parties' differing views on the stock grant and deferred compensation issues, as well as their differing views on the provisions of the parties' stipulations and law that should determine those issues.

The court expressed skepticism that Jane had provided any basis in fact or law for her argument that Stewart could owe child support on bonuses received after the child support period ended, and/or that Stewart could owe child support on stock grants that became saleable after the child support period ended. The court continued the hearing "so that [the court] [could] digest the law and the relevant agreements a bit more." Further to this end, the court instructed the parties to prepare a "side-by-side [comparison] showing [Jane's] analysis versus [Stewart's] analysis" of the amounts of child support owed and paid that reflects an "assumption . . . that any compensation that didn't vest until after Cecelia graduated from high school . . . should not be included."

20

## L. *February 18, 2021 Hearing and Decision*

The parties did not jointly prepare the comparison requested by the court.

Instead, Jane filed a document styled a "joint supplemental brief" containing a table with narrative descriptions of Jane's positions on various issues under the heading "[Jane's] brief." (Capitalization omitted.) Under the heading "[Stewart's] brief," the table contained the notation "[n]o submission received from [c]ounsel for [Stewart]." (Capitalization omitted.) Jane also submitted two declarations "re[garding] [Jane's] joint supplemental brief." (Boldface & capitalization omitted.) As the court had requested, Jane's submissions did not identify any amounts she was seeking based on stock grants that did not vest until after the support period. Rather, Jane identified the following amounts sought: $7,597.11 (plus interest) in unpaid child support based on the undisclosed income from MGM Resorts in January and February of 2016 and $8,220.00 (plus interest) in support based on the applicable *Ostler-Smith* percentage of a pro rata share of the $800,000 cash bonus Stewart received in December 2017 from MGM Growth (half of the bonus, given that the support period ended in June 2017). Jane also argued that no support was owed to Stewart based on his claimed overpayment during the support period, arguing that his calculations leading to this conclusion misread the stipulations and were flawed.

Stewart submitted a declaration regarding "side-by-side [of] base child support and Smith-Ostler payments" that, like Jane's "joint submission" included a blank column for Jane's competing claims. (Boldface & capitalization omitted.) Stewart's table identified: (1) the specific amounts of base child support and *Ostler-Smith* support Stewart believed he owed for the period between December 1, 2014 and June 9, 2017, (2) the specific

21

amounts he paid Jane for each type of child support during this period, and (3) the specific amount that he believed Jane owed him as a result of his overpaying *Ostler-Smith* support during this period (essentially the difference between categories (1) and (2)). Attached to the declaration were Stewart's pay stubs for the period of December 1, 2014 through June 2017, as well as cancelled checks reflecting the payments listed in the chart. Among the pay stubs were several from MGM *Resorts* covering the January through February 2016 time period. The amount of income reflected in these corresponds with the $89,230.79 in income reflected in the MGM Resorts W-2 Jane had obtained in discovery. The total base salary amount indicated for 2016 in these tables also takes into account this $89,230.79 in income from MGM Resorts, as indicated in a footnote to the table and consistent with the supporting documentation. In her briefing, Jane took issue with various aspects of the calculations reflected in the tables Stewart offered, but she did not claim that the amounts he calculated were unsupported by or inconsistent with the pay stubs attached thereto.

Stewart's tables reflect that the *Ostler-Smith* support he claimed he owed was calculated using only cash bonuses he received, or stock grants that became saleable, prior to June 2017. Thus, Stewart's table does not indicate that Stewart paid child support based on any portion of his 2017 annual bonus, nor does it attach any pay stubs or other income documentation dated after June 2017.

At the hearing on February 18, 2021, the court described the amended child support RFO as "entirely driven by what I would describe kindly as wishful thinking" and as reflecting a "fundamental misunderstanding" that child support can be owed on income that vests or is received after the support period ends. The court rejected "the idea that [Stewart] would owe support in

22

the sort of community property way based on . . . any potential for a bonus" because he "received that potential . . . before [the child] aged out." The court concluded this concept was inconsistent with the parties' 2003 judgment (both its original form and as amended by subsequent stipulations), and that it "just doesn't fit with the law," "common sense" or "the definition of income under I.R.S. regulations, under the Family Code."

The court questioned the reliability of the Quiel and Howdeshell declarations. Specifically, it noted a "huge disconnect" in Howdeshell's opinion "projecting that [a] father will owe child support for a child who ages out in 2017 for years after that." And the court concluded Quiel's opinions that "any compensation under [Stewart's employment agreement] . . . awarded in 2016 and 2017 was earned and payable even if it vests/pays in subsequent years," "doesn't fit with the face of the agreement," and "doesn't fit with common sense."

The court's resolution of the stock grant and deferred compensation issues in this manner—namely, its conclusion that Stewart was not obligated to report or pay child support based on income he received or that vested after the conclusion of the support period—disposed of most of Jane's claims for arrearages. As to Jane's claim that Stewart had failed to pay child support based on the income he earned from MGM Resorts in January and February 2016—the only claim not affected by the deferred compensation or stock grant issues the court decided in Stewart's favor—the court found that this income already "was included in the computation of support for 2016." Accordingly, the trial court found that Jane had not shown Stewart had received income on which he was obligated, but failed, to pay child support, or that he had hidden any such income from Jane. The court further found

23

Stewart had "compl[ied] in good faith with the obligations that he understood."

The court found that "no child support arrears owed by [Stewart] as [Jane] had alleged in [the amended child support RFO]. The court also concluded that, even if [Stewart] had overpaid child support as he contended, the court would not order [Jane] to pay any such amounts back and instead would view any such overpayments as a gift to the parties' daughter, who is now 22."

The court denied Jane's request that it impose sanctions on Stewart, relying on the court's earlier findings that Stewart had been acting in good faith and had been "quite transparent in his efforts to comply with the support obligations as he reasonably understood them."

The court granted Stewart's request for sanctions against Jane "in the amount of $48,000 . . . under . . . section 271," $4,100 of which the court noted were "also warranted and authorized under the provisions of the [Code of Civil Procedure] cited in [Stewart's]" motion for protective order, based on Jane "imposing disproportionate discovery and other litigation burdens without sufficient justification or reflection and demonstrating an inability to cooperate or compromise with opposing counsel." The court expressly declined to reach the issue of whether Jane's requests for order had been frivolous, and instead based its sanctions order on its finding that Jane "behaved unreasonably in these proceedings" and engaged in "over-litigation" that had "consumed tremendous resources on the side of the parties and a lot of court resources, as well," such that section 271 sanctions were "warranted."[7] The court

_____

[7] "As just one example," the court noted that instead of providing the side-by-side comparison the court had requested for

24

afforded both parties' counsel the opportunity to address "whether or what amount" of sanctions would impose an unreasonable burden on Jane.

The court denied "[a]ll other relief" "including [Jane's] . . . request for need-based attorney's fees." In so doing, the court acknowledged Jane's financial ability was significantly less than Stewart's, but noted that "one of the questions the court has to answer [in deciding a request for such fees] is whether the fees were reasonably incurred." The court found this factor dispositive. It characterized the fees sought as "fees for what seems to have been sort of a costly kind of fishing expedition that really was based on . . . wishful thinking and a real misunderstanding." The court further noted that "everything here got so complicated and so drawn out, there was just a lot of sort of misunderstanding and bluster."

Jane timely appealed.

## DISCUSSION

On appeal, Jane challenges: (1) the denial of the amended child support RFO, (2) the sanctions award against her, (3) the denial of her request for section 271 sanctions against Stewart, (4) the denial of her request for attorney fees, (5) the protective order, and (6) the court's failure to rule on, and thus implicit overruling of, certain evidentiary objections.

---

the hearing, Jane had made "at least six other filings . . . none of them being [what] the [court] needed."

25

## A. *Interpretation of the 2003 Judgment Provisions Governing the Deferred Compensation and Stock Grant Issues*

How to properly interpret the 2003 judgment regarding the stock grant issue and deferred compensation issue are threshold questions for analyzing all of Jane's appellate challenges. We therefore answer these questions at the outset of our analysis. We then consider each of the rulings Jane challenges with these answers in mind.

A trial court's interpretation of a stipulated judgment is a question of law that we review de novo. (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.) A stipulated judgment is a contract to which we apply the same legal principles we apply to contracts generally. (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1585.)

Jane's positions as to both of these key issues is driven by her view that, under the 2003 judgment, which bonus income Stewart must pay child support on depends on when that income is *earned*— not when it is actually received, vests, or becomes liquid. Jane argues that as long as the income compensates Stewart for work he did during the support period, it is income on which Stewart must pay child support. Stewart counters that the 2003 judgment only requires him to pay support on income that is either (1) received in liquid form during the support period, or (2) EICP or equivalent stock grant compensation that vests during the support period. Neither party is entirely correct.

We disagree with Jane that the 2003 judgment requires Stewart to pay child support on *any* income beyond his base salary that he receives in *any* form, as long as it was earned during the support period. This is not what the 2003 judgment (or any subsequent stipulation amending it) states. Other portions of the

26

2003 judgment—those involving spousal support—*do* speak in terms of when income is "earn[ed]" as the dividing line.  This makes the lack of such language in the child support provisions or any of the subsequent stipulations all the more telling.  Even if we were to accept Quiel's "expert" conclusion that all compensation contemplated by Stewart's MGM Growth employment agreement is guaranteed at the time of signing—and we are skeptical that such legal interpretation can ever be the proper subject of expert opinion—neither the 2003 judgment, nor any subsequent stipulation, assigns child support obligations based on whether or not income is "guaranteed" or when it is guaranteed.[8]

The judgment explicitly addresses which bonus income is to be considered a basis for Stewart's *Ostler-Smith* child support obligations in two sections.  First, section 3.1 requires Stewart to pay as "additional child support" beyond the monthly amount based on his regular salary, certain "add-ons," defined as including only two things:  "Eight percent (8 [percent]) of [Stewart's] gross bonus

---

[8] The cases Jane cites in arguing to the contrary are of no assistance to her in that they do not address the interpretation of a stipulated judgment even similar to the one at issue here.  These cases are also inapposite in that they address community property concepts or factual scenarios entirely distinguishable from that presented by this appeal.  (See *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150 [a stock option that cannot be exercised until after the date of separation is recognized as community property if the stock options were awarded prior to separation]; *In re Marriage of Hug* (1984) 154 Cal.App.3d 780 [stock options granted during the marriage deemed a community asset although they were not exercisable until after the date of separation]; *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070 [father could not avoid his child support obligations by voluntarily deferring receipt of his salary until after the obligation was due].)

27

income"—defined as "all income from employment in excess of base salary . . . not includ[ing] other investment income of any description"—and "[e]ight percent (8 [percent]) of the gross amount of the Equity Incentive Compensation Plan (includes units and options and is hereinafter referred to as 'EICP') vesting during the term." In the unpublished opinion summarized above, this court deemed another form of vesting stock grant compensation offered by UBS (EOP stock grants) to be the "functional equivalent" of EICP and thus subject to the provisions governing EICP stock grants in the 2003 judgment. By the logic of that opinion, other vesting stock grant compensation that is the "functional equivalent" of EICP in the manner the opinion described would likewise be included in this obligation, to the extent it "vest[s] during the term" of Stewart's support obligations. Section 3.1 further clarifies that such child support based on EICP (or similar) stock grants becomes the property of Jane as of the date of vesting, but need not be paid to Jane until the subject "EICP becom[e] saleable."[9]

Second, section 3.2—on which Jane primarily relies—addresses termination of child support obligations and, more importantly for our purposes, how to handle certain bonus income Stewart receives after the termination of the support period. Namely, section 3.2 provides that the income on which Stewart must pay child support "includes the pro rata portion of [Stewart's] add-on income for that calendar year [that the support obligation ends], which is paid in the following calendar year (currently in January)." (Capitalization omitted.) Via the definition of "add-on"

_____

[9] As noted above, although the stock grants become Jane's property upon vesting, if and when Jane receives child support funds based thereon, she must deposit those funds "into two equal long term investment accounts, one for each of the children, to be turned over to the respective child upon reaching age 25."

28

discussed above, section 3.2 requires that Stewart pay child support based on (1) "gross bonus income" he receives after the termination of the support period, but that is in recognition of work performed during the covered portion of the year his support obligations ended; and (2) EICP grants (or similar stock grants) that "vest[ ] during the [support period]," but that do not actually pay out/become saleable until the following calendar year.

We turn now to the effect of subsequent stipulations amending the 2003 judgment on our analysis of sections 3.1 and 3.2. Stewart points in particular to the requirement in the 2014 stipulation that "[Stewart] shall pay Ostler/Smith bonus child support based on his gross income as reflected on his pay check stub less base salary, RSU dividends and dental-SEC 125 and medical-SCE 125 under 'other deductions from pay' on said pay check stub." (Capitalization omitted.) Stewart treats this language of the 2014 stipulation as trumping section 3.2, such that the judgment now requires him to pay child support based solely on cash bonuses reflected in pay stubs for the support period. But the 2014 stipulation does not require that the "gross [bonus] income" to which *Ostler-Smith* obligations attach be reflected on a pay stub *issued* during the support period; it only requires such bonus income be reflected on a pay stub. Nor does the 2014 stipulation purport to amend section 3.2 to the extent it applies to "add-on" income in the form of EICP (or equivalent) stock grants that vest during the support period, but may not become liquid until the following year.

We therefore conclude that the 2003 judgment, as amended via the parties' stipulations, requires Stewart to pay *Ostler-Smith* support on (1) bonus income, to the extent it is reflected in a pay stub, including bonus income attributable to work performed during some portion of the year the support period ended, even if

29

Stewart does not receive the bonus until after the support period is over, and (2) bonus income in the form of EICP (or their functional equivalent stock grant compensation) that vests during the support period, regardless of when the underlying stock becomes saleable/liquid.

We note that the resolution of the deferred compensation and stock grant issues is not simple or obvious. Nevertheless, each of the parties has argued, both on appeal and below, that the other party's interpretation of the 2003 judgment as to these issues is plainly erroneous and without merit. In this respect, both parties are wrong. Given the complicated child support provisions in the 2003 judgment and multiple potentially relevant stipulations amending it, neither party's position appears to have been in bad faith.

### B. *The Court's Ruling on the Amended Child Support RFO*

We now apply our resolution of the deferred compensation and stock grant issues to the specific income on which Jane claimed, via the amended RFO, that Stewart owed her child support. Specifically, we consider whether substantial evidence supports the court's findings that, under the 2003 judgment as we interpret it above, Stewart does *not* owe Jane child support based on the following income she claims he failed to report: (1) stock grants from MGM Growth that did *not* vest during the child support period, (specifically, the April 2016 PSU award, April 2017 RSU award, April 2017 PSU award, and 2017 deferred bonus RSU award), (2) the $400,000 bonus PSU stock grant that vested upon its grant date around December 2016, and thus *did* vest during the child support period, (3) a cash bonus from MGM Growth of $800,000 that Stewart received around December 2017, and (4) approximately $89,000 in non-bonus income from MGM

Resorts between January and February 2016. As discussed further below, we agree with Jane that Stewart owes her child support on some, but not all, of this income.

### 1. *Stock grant income not vesting during the support period*

Under our interpretation of the 2003 judgment above, Stewart is not obligated to pay child support on stock grants vesting after termination of the support period. Jane did not present any evidence suggesting that the April 2016 PSU award, April 2016 RSU award, April 2017 RSU award, April 2017 PSU award, and 2017 deferred bonus RSU award identified in the MGM Growth proxy statements vested during the support period. To the contrary, the description of RSU and PSU stock grants suggests they vest, if at all, several years after their grant dates. And according to the MGM Growth proxy statements Jane offered at the hearing, deferred bonus RSU awards vest on the date granted (here, around December 2017, several months after the conclusion of the support period).

Section 3.2's pro rata allocation language does not render the December 2017 deferred bonus RSU award a proper basis for support, because section 3.2 applies to only two types of "add-on" compensation (gross bonus income reflected in a pay stub and EICP or functional equivalent stock grant income that vests during the support period), neither of which encompasses the 2017 deferred bonus RSU award.

Therefore, substantial evidence supports the court's conclusion that Stewart was not obligated to pay child support based on the April 2016 PSU award, April 2016 RSU award, April 2017 RSU award, April 2017 PSU award, and 2017 deferred bonus RSU award identified in the MGM Growth proxy statements.

31

## 2.    *December 2016 bonus PSU award*

We turn next to the bonus PSUs MGM Growth granted Stewart around December 2016.  As outlined above, stock grants that are the "functional equivalent" of EICP in that they are "noncash stock benefits requiring vesting and lengthy periods before becoming convertible into cash" "should . . . be[ ] treated the same [as EICP] under the stipulated judgment."  Bonus PSUs meet this criteria and are thus subject to the terms of the judgment governing EICP, which require Stewart to pay *Ostler-Smith* support on EICP grants that vest during the support period.  Unlike the other stock-based compensation discussed above, nothing in the record supports a conclusion that the December 2016 bonus PSU award did not vest during the support period.  To the contrary, the 2017 MGM Growth proxy statement describes bonus PSUs as vesting on the date granted—here, around December 2016, six months before the support period ended.  Therefore, the additional child support Stewart owes based on these stock grants "bec[ame] the property of [Jane]" as of December 2016, and Stewart must pay that support once the underlying stock become saleable.

## 3.    *December 2017 cash bonus*

Under our interpretation of the 2003 judgment, Stewart was obligated to pay child support based on "gross bonus income" reflected in pay stubs and received after the termination of the support period if they were compensation for work performed, in whole or in part, during the last year of the support period.  Stewart does not dispute that he received an $800,000 cash bonus around December 2017 for work he performed throughout 2017, including during the first half of that year, and thus in part during the support period.  He does not dispute that such income would have appeared on his pay stubs.  Nothing in the record suggests

32

otherwise.[10] Nor does the record contain evidence that Stewart made any child support payments based on this bonus income. Thus, substantial evidence does not support that Stewart paid the *Ostler-Smith* support the 2003 stipulation requires him to pay on the December 2017 cash bonus he received from MGM Growth.

### 4.  *2016 MGM Resort income*

Jane's claim for child support based on Stewart's 2016 MGM Resorts income is the only issue in her RFO that does not depend on resolution of the deferred compensation and stock grant issues. Stewart provided pay stubs from MGM Resorts covering the entire January through February 2016 period that correspond with the approximately $89,000 in income reflected in the MGM Resorts W-2 Jane identifies. He also provided paycheck stubs reflecting his payment of child support on those amounts. This constitutes substantial evidence to support the court's conclusion that the MGM Resorts W-2 does not reflect income on which Stewart owes additional child support. This would be the case even if Jane had identified any evidence contradicting the pay stubs and checks Stewart offered into evidence, which she has not.

In sum, substantial evidence supports the court's order on the amended child support RFO, except to the extent that it concluded Stewart had paid child support he owed based on the $800,000 cash portion of his 2017 bonus from MGM Growth and the $400,000 of bonus PSUs MGM Growth granted him around December 2016. Stewart has owed Jane child support based on the 2017 cash bonus

---

[10] The evidence and tables Stewart presented at the February 2017 hearing detailed how he had paid child support on all income reflected in pay stubs through June 2017. These thus do not speak to whether Stewart paid support on a bonus received after June 2017.

since he received it. The applicable percentage of the bonus PSU grant became Jane's property as of the date it vested (approximately December 2016), but Stewart only owes her payment based on this property right beginning when the stocks underlying the grant become/became saleable. The record does not definitely indicate whether or when that has occurred.

### C. *Court's Ruling on Stewart's Motion for Sanctions*

We review sanctions awards for abuse of discretion. (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1316; *In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225 (*Corona*).) "Accordingly, we will overturn such an order only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order. [Citations.] 'We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review.' [Citation.]" (*Corona, supra*, at pp. 1225–1226.) Here, the court ordered sanctions against Jane under both section 271 and various sections of the Code of Civil Procedure cited in Stewart's motion for protective order. We address each basis in turn below.

### 1. *Section 271 sanctions*

Section 271 authorizes the imposition of attorney fees and costs as a sanction against litigants whose conduct undermines the policy of promoting settlement of litigation and cooperation between litigants. (See § 271, subd. (a).) Although the party asking the court to impose such sanctions is not required to show financial need, "the court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed," and in making an award pursuant to this section, the court "shall take into consideration all evidence

34

concerning the parties' incomes, assets, and liabilities." (§ 271, subd. (a).)  We review the trial court's decision on whether to impose sanctions for abuse of discretion.

Jane argues the court abused its discretion in imposing section 271 sanctions against her because, contrary to the contentions in Stewart's motion for sanctions, her child support RFO and amended child support RFO were meritorious, and her efforts to doggedly pursue them therefore justified.  She further argues the court erred because it did not sufficiently take into account the unreasonable financial burden the sanctions would impose on her.

Stewart's motion for section 271 sanctions was premised in large part on the argument that Jane's child support RFO and amended child support RFO were frivolous in that Jane was interpreting the 2003 judgment in a manner inconsistent with clear guidance from the Court of Appeal and the unambiguous language of the parties' stipulations.  We disagree that the Court of Appeal decision clarified the stock grant issue, because that decision dealt with a separate and much narrower question.  And although the parties may have intended to clarify the treatment of stock grant compensation with their stipulations, they did not do so to such an extent that Jane's proposed interpretation could be deemed frivolous.  Further, we have concluded that the court erred and Jane was correct that Stewart did, in fact, owe her child support.

Moreover, Jane's initial child support RFO sought tax and other financial documents from Stewart that the parties had unambiguously agreed to provide each other, and that Stewart had refused to provide to Jane or her counsel through informal channels.  Jane was not required to take Stewart at his word that the calculations he presented alongside his child support payments accurately reflected his income.  Nor was she required to accept as

sufficient the tax documents Stewart later provided that did not include information about bonus income received in late 2017 or early 2018, given our interpretation of the 2003 judgment.

Nevertheless, the court did not base its sanctions award on Stewart's argument about the merits of Jane's request. Instead, the court focused on findings that Jane had failed to cooperate with opposing counsel and had "over-litigat[ed]" the dispute and rendered it unnecessarily complicated, wasting the court's and the parties' time, and unnecessarily causing Stewart to incur attorney fees and costs. The record does not support these findings.

First, substantial evidence does not support that Jane refused to cooperate with opposing counsel. Jane did not refuse to engage in efforts to resolve the parties' dispute informally, nor did she refuse to meet and confer with opposing counsel. The parties corresponded—albeit at times using the extreme language of impassioned advocates—extensively regarding Jane's requests for documents and her view that Stewart was withholding information, based on which he owed child support. Jane refused to back down from these requests as Stewart demanded. But Stewart *was* in fact withholding documents—specifically, full 2017 and 2018 tax and financial documents—to which Jane was entitled under the 2003 judgment and that reflected Stewart *did*, in fact, owe additional child support. As noted above, it was not immediately apparent how to interpret the 2003 judgment as to the vested stock grant issue, so the fact that Jane—like Stewart—did not back down from her stated view of the appropriate interpretation is not a lack of cooperation. The record does not support that Jane acted in bad faith in insisting her interpretation of the issue was correct, nor does it suggest that any lack of cooperation, rather than the parties' contrary interpretations of the judgment, prevented meaningful cooperation or settlement.

36

Second, as to Jane's "over-litigat[ion]" of the issues, the court correctly noted that Jane made numerous and voluminous filings. But the record does not support that such filings are to blame for the proceedings becoming complicated and drawn out. The stock grant issue was never simple, and the parties' opposite interpretations of the 2003 judgment also belies the idea that the dispute could have been resolved informally, quickly, or simply.

Moreover, in assessing whether to impose section 271 sanctions, the court should consider the extent to which "the conduct of *each* party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a), italics added.) Here, the record as a whole reflects that *both* parties took an approach that, overall, expanded the length and scope of the proceedings below. For example, Jane chose to request from Stewart numerous detailed categories of documents, as opposed to simply asking for the tax documents to which she was clearly entitled. But Stewart also initially refused to provide even those tax documents, and to instead seek a protective order. Similarly, although there does not appear to have been any meaningful movement towards settlement regarding the child support RFO or the amended child support RFO, this was at least in part attributable to Stewart's position that the only way Jane could avoid his filing a sanctions motion was to withdraw her child support RFO which, as noted above, was not without merit. Another example expressly noted by the trial court in its decision is that Jane failed to provide the requested side-by-side comparison, and that she instead made numerous other filings. But both parties failed to provide such a side-by-side comparison, and the record does not support that this is solely attributable to Jane's refusal to cooperate. And the court did not

37

find—nor does the record support—that Jane's supplemental brief or the related documents Jane submitted instead were frivolous or that they attempted to avoid addressing the court's question. It is true that Jane's submissions include a fair amount of repetition, as the cross-motions for sanctions, motion for protective order, child support RFO, and motion for attorney fees all turned, to some extent, on the stock grant and deferred compensation issues. But neither this overlap, nor the fact that the court found many of the filings unhelpful, supports that Jane over-litigated the matter to such an extent that it would be within the court's discretion to impose sanctions.

We acknowledge that trial courts have broad discretion in assessing section 271 sanctions. (See, e.g., *Corona* supra, 172 Cal.App.4th at pp. 1225−1226.) But given that the record does not support that Jane refused to cooperate with opposing counsel, and that both sides refused to budge from positions that were not frivolous, and that nothing suggests Jane acted in bad faith in what the court deemed to be over-litigation of the case, even "considering all of the evidence viewed most favorably in . . . support [of the court's award] and indulging all reasonable inferences in its favor, no judge could reasonably make the [sanctions] order" against Jane. (*Ibid.*) We therefore need not consider Jane's arguments that the court failed to sufficiently consider whether the sanctions imposed an undue financial burden on her.

### 2. *Sanctions under the Code of Civil Procedure*

The court noted that $4,100 of the sanctions it ordered against Jane were also recoverable under Code of Civil Procedure sections 2030.090, subdivision (d), 2031.060, subdivision (h), and 2033.080, subdivision (d), because Jane unsuccessfully opposed

Stewart's request for a protective order.[11]  These sections authorize sanctions for unsuccessfully opposing a motion for a protective order "unless [the court] finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust."  (Code Civ. Proc., § 2033.080, subd. (d); *id.*, §§ 2030.090, subd. (d) [same], 2031.060, subd. (h) [same].)  We conclude the court abused its discretion in awarding sanctions under these sections as well.  As discussed above, Jane was substantially justified in seeking income and tax documents from Stewart, including from the latter half of 2017 and from 2018.  The court's award of sanctions against Jane was thus an abuse of discretion to the extent it was based on the Code of Civil Procedure sections cited in the protective order motion as well.

### D.  *Sanctions Motion Against Stewart*

Jane next argues that the court abused its discretion in denying her motion for section 271 sanctions against Stewart.  Because Jane bore the burden of proof on her sanctions motion below, our substantial evidence review of implicit and express factual findings supporting the court's denial of the motion—that

---

[11] Jane also appeals the court's ruling granting the protective order.  Stewart argues that this order is not appealable at this stage.  We need not consider these issues.  Even if Jane is correct that the court erred in imposing the requested protective order, based on our analysis above, any such error was not prejudicial to Jane's child support RFO or amended child support RFO.  (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801 [" 'No form of civil trial error justifies reversal . . . where in light of the entire record, there was no actual prejudice to the appealing party.' [Citation.]  Accordingly, errors in civil trials require that we examine 'each individual case to determine whether prejudice actually occurred in light of the entire record.' "].)

39

is, the court's conclusion that Jane had not met her burden of proof—looks slightly different than usual. Namely, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279; *Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571 [question is whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding"].)

Jane argues sanctions were justified because Stewart (1) refused to provide documents in response to her discovery requests, (2) threatened to seek sanctions if Jane did not withdraw her child support RFO, (3) filed a procedurally defective sanctions motion, (4) made a single "onerous and totally one-sided [settlement] offer," and (5) rejected mediation and settlement efforts, and (6) "intentional[ly] distort[ed] . . . applicable [c]ourt [o]rders" in his sanctions motion and other filings. As to the final basis, the record does not compel the conclusion that Stewart intentionally misread the 2003 judgment as to the deferred cash compensation issue. As noted, neither party's position was frivolous, nor does any other evidence in the record compel the conclusion that Stewart's approach to this issue was intentionally incorrect.[12] As to the remainder of the conduct identified, accepting

---

[12] Jane argues that Stewart changed his interpretation of the 2003 judgment as to the stock grant and deferred cash compensation issues over the course of the proceedings below, and that this supports a conclusion that the trial court erred in denying sanctions against him. To the extent Jane is arguing that such changes constitute evidence supporting a finding that Stewart

40

for the purposes of argument that it is all supported by the evidence in the record, we conclude that it does not establish the court abused its discretion in denying sanctions against Stewart. Particularly when we consider this conduct in the broader context of the parties' interactions discussed above in the context of the sanctions imposed on Jane, and "considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor," a judge "could reasonably make the order" denying sanctions against Stewart. (*Corona, supra,* 172 Cal.App.4th at p. 1225.)

### E. *Attorney Fees Request*

Section 2030 authorizes a court to order, "if necessary based on the [court's] income and needs assessments" of the two parties in a dissolution or related action, that one party pay the attorney fees of the other party "reasonably necessary" to maintain or defend the proceeding. (See § 2030, subd. (a)(1).) "[T]he making of the award, and the amount of the award, [must be] just and reasonable under

---

intentionally misinterpreted the judgment, we are not persuaded. First, Jane does not support this argument with any citations to the record. (See *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149 ["We may disregard a [party's] statements of fact when those statements are unsupported by citations to the record. [Citation.] And we will not scour the record on our own in search of supporting evidence. [Citation.] Where, as here, [parties] have failed to cite that evidence, they cannot complain when we find their arguments unpersuasive."]; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 ["[a]n appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority"].) Second, Jane offers no legal support for the proposition—of which we are skeptical in any event—that a party's changing position in litigation alone is evidence of intentional misinterpretation.

41

the relative circumstances of the respective parties." (§ 2032, subd. (a).) The party seeking the fees bears the burden of proving entitlement thereto, including providing sufficient information about the services rendered to establish the fees sought were reasonably necessary. (See Cal. Rules of Court, rule 5.427(b); see *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 869 (*Keech*) [court could not determine whether fees reasonably necessary without information establishing that fees were actually incurred and for what].)[13]

Jane failed to provide sufficient documentation, based on which the court could conclude that the fees she sought were reasonably incurred. She offered no invoices from her counsel, no description of the work performed or hours spent on specific tasks or even categories of tasks. Instead, she offered a rough estimate of the number of hours her counsel had worked on the matter and his hourly rate. The court thus did not have a basis on which to

---

[13] This rule states in pertinent part: "[T]o request attorney's fees and costs, a party must complete, file and serve the following documents: [¶] . . . [¶] (B) request for attorney's fees and costs attachment (form FL-319) or a comparable declaration that addresses the factors covered in form FL-319; [¶] (C) [a]current income and expense declaration (form FL-150); [¶] (D) [a] personal declaration in support of the request for attorney's fees and costs, either using supporting declaration for attorney's fees and costs attachment (form FL-158) or a comparable declaration that addresses the factors covered in form FL-158; [and] . . . [¶] . . . [¶] (2) The party requesting attorney's fees and costs must provide the court with sufficient information about the attorney's hourly billing rate; the nature of the litigation; the attorney's experience in the particular type of work demanded; the fees and costs incurred or anticipated; and why the requested fees and costs are just, necessary, and reasonable." (Cal. Rules of Court, rule 5.427(b)(1)(B), (C), (D) & (b)(2), capitalization omitted.)

determine whether the specific legal work performed, and the hours it took, were reasonably necessary. "Without ascertaining . . . that the work was 'reasonably necessary' in light of the issues in the case, the trial court [cannot] properly find that imposing upon [one party responsibility for the other party's] legal bill was 'just and reasonable under the relative circumstances of the respective parties' as required by section 2032." (*Keech, supra,* 75 Cal.App.4th at p. 869.) The court thus did not abuse its discretion in denying Jane's request for fees.[14]

### F.    *Evidentiary Rulings*

Jane challenges the court's failure to rule on several of her written evidentiary objections, which we treat as a presumptive overruling of those objections. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.) But Jane offers no argument or legal authority supporting that the court erred in presumptively overruling these objections. She appears to argue that the trial court reversibly erred by the mere fact that it failed to rule on the objections. This is not reversible error.

---

[14] The parties have also briefed the issue of whether Jane sufficiently established her relative ability to pay. We need not reach this issue, as our conclusion above is a sufficient basis on which to affirm the court's decision.

## DISPOSITION

The court's February 2021 order on the amended child support RFO is reversed to the extent it denies Jane *Ostler-Smith* child support based on the $800,000 cash bonus Stewart received from MGM Growth around December 2017 and the $400,000 bonus PSU grant Stewart received around December 2016. Upon remand, the court is instructed to determine the pro rata portion of that bonus income attributable to the support period, and to order the corresponding amount of *Ostler-Smith* child support.

The court's order imposing sanctions against Jane is reversed.

The court's orders are in all other respects affirmed, including specifically the court's denial of attorney fees for Jane and its denial of section 271 sanctions for Stewart.

The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

BENKE, J.*

---

*Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.